IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

| | | |
|---|---|---|
| In re IRS § 1031 Exchange Litigation | ) | MDL No.: 8:09-mn-2054-JFA |
| _____ | ) | |
| | ) | |
| Gerald R. Terry, Ann T. Robbins, and Jane T. Evans, on their own behalf and on behalf of a class of others similarly situated, | ) ) ) ) ) | C/A No.: 8:09-cv-415-JFA |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SunTrust Banks, Inc., Theodore L. Chandler, Jr., Christine R. Vlahcevic, G. Williams Evans, and Stephen Conner, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| Angela M. Arthur, as Trustee of the Arthur Declaration of Trust, dated December 29, 1988; Vivian R. Hays, an individual; Leapin Eagle, LLC, a limited liability company; Denise J. Wilson, an individual; and all others similarly situated, | ) ) ) ) ) ) ) | C/A No.: 8:09-cv-1739-JFA |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SunTrust Banks, Inc., a Georgia corporation; G. Williams Evans, an individual; Stephen Connor, an individual, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

This matter is before the court on the second motion of Defendant SunTrust Banks, Inc. ("SunTrust") to dismiss the claims of Gerald Terry, Ann Robbins, Jane T. Evans, Angela M. Arthur, Vivian Hayes, Leapin Eagle LLC, and Denise Wilson (collectively, the "Exchangers"). After reviewing the parties' briefs and welcoming oral argument, the court grants Defendant SunTrust's motion to dismiss the Plaintiff's second amended consolidated complaint.

## BACKGROUND

LandAmerica 1031 Exchange Services, Inc. ("LES") offered its services as a qualified intermediary to individuals seeking to effect a tax deferred like-kind exchange under § 1031 of the Internal Revenue Code. 28 U.S.C. § 1031. For a flat fee of between $600 and $1,000, and a $250 closing fee, LES would hold the proceeds of a real estate sale (the "Exchange Funds") until such time as the customer identified and sought to close on a target property. At closing, LES would transfer the Exchange Funds to the seller of the target property.[1] Through using LES as a qualified intermediary, a customer could avoid realizing a taxable gain on the sale of his property, as the customer avoids possession of the initial sale proceeds. When a § 1031 exchange is carried out correctly, any taxable gain is deferred until the target property is sold. A contract (the "Exchange Agreement") set forth the relationship and obligations between the LES and the Exchangers.

---

[1] Section 1031 requires a seller to identify like-kind property within forty-five days from the date of the sale of the original investment property, and it provides the seller 180 days to close on the purchase of replacement property. Failure to consummate the transaction within the allotted time results in loss of the § 1031 tax benefit. *See* 26 U.S.C. § 1031.

2

The Exchangers allege that LES placed their Exchange Funds in LES's general operating account at a SunTrust bank located in Richmond, Virginia, known as the 3318 Account. The Exchangers further allege that LES used Exchange Funds from the 3318 Account to purchase auction-rate securities ("ARS") through a SunTrust subsidiary. When the ARS market froze in February of 2008, the Exchangers allege that LES held more than $200 million in ARS and that LES suffered substantial losses stemming from the illiquidity of its ARS holdings. Due to the illiquidity of the ARS after February 2008, the Exchangers allege that LES began to use Exchange Funds from new customers, such as the Exchangers, to complete exchanges for existing customers—effecting a Ponzi scheme.

On November 26, 2008, LES filed for bankruptcy, which had the effect of freezing all Exchange Funds and preventing the Exchangers and other § 1031 exchange participants from completing their transactions or from accessing their funds. The Exchangers' theory of the case posits that LES should have ceased operations and distributed the remaining proceeds when the ARS market froze in February 2008. They allege that by continuing to solicit new clients after February of 2008, including the Exchangers, and using their Exchange Funds to complete exchanges for those customers whose money was tied up in illiquid ARS, LES breached its fiduciary duty owed to the Exchangers and converted their Exchange Funds.

SunTrust's involvement allegedly consisted of substantially assisting LES in converting the Exchangers' Exchange Funds in hopes of being repaid the $100 Million remaining on a $200 Million revolving line of credit SunTrust had originally loaned LES'

3

parent, LandAmerica Financial Group, Inc. ("LFG"), in July of 2006. The Exchangers assert that SunTrust assisted in the alleged Ponzi scheme with the aim of keeping LES in business long enough for the ARS market to thaw or for LES to obtain alternative financing to fund the deficit in the trust account. At bottom, the Exchangers allege that because a SunTrust subsidiary sold LES the ARS, and because LES deposited the Exchange Funds in SunTrust accounts, SunTrust necessarily knew about and participated in LES's alleged financial scheme.

Specifically, the Exchangers contend that SunTrust knew (1) that LES was a qualified intermediary; (2) qualified intermediaries act as fiduciaries; (3) that LES was to hold Exchange Funds up to 180 days, but no longer; (4) that the identity of LES's customers changed daily; (5) that the Exchangers' money was deposited at SunTrust to be held by LES as an agent and fiduciary pursuant to the Exchange Agreement; (6) that the terms of the Exchange Agreement included a provision that Exchange Funds were not fully protected by the FDIC; (7) that Exchange Funds were not held in FDIC protected accounts; (8) that LES was affiliated with the Federation of Exchange Accommodators; (9) that LES acknowledged its fiduciary capacity in the transactions; (10) that LES acknowledged it held funds in escrow; (11) that LES acknowledged that the funds were the property of customers; (12) that LES commingled funds in the SunTrust 3318 account; (13) that SunTrust Account 3318 was an operating account; (14) that LES used new funds to complete transactions for existing customers; (15) that LES was not maintaining the availability of Exchange Funds; (16) that LES was operating with a significant Exchange Fund deficit; (17) that LES held $290 million

in ARS that could not be used to complete transactions; (18) that LES's liquidity problems threatened its viability; and (19) that LES was operating a Ponzi scheme. Based on the forgoing, the Exchangers assert four claims against SunTrust: (1) aiding and abetting LES's breach of fiduciary duty, (2) conversion, (3) aiding and abetting LES's conversion, and (4) civil conspiracy. This court previously granted SunTrust's motion to dismiss all of the Plaintiffs' claims against it, but afforded the Plaintiffs the opportunity to replead their claims. The Plaintiffs amended their complaint, and now SunTrust again moves to dismiss the Plaintiff's causes of action as asserted against it.

## **LEGAL STANDARD FOR A RULE 12(b)(6) MOTION TO DISMISS**

Pursuant to Rule 8(a)(2), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive a motion to dismiss, a complaint must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, __U.S.__, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Recitals of the elements of causes of action bolstered only by conclusory statements are insufficient, a plaintiff cannot rest on a showing of a "sheer possibility that a defendant has acted unlawfully." *Id.*

Pursuant to *Iqbal* and *Twombly*, this court must undertake a two-prong approach in determining the sufficiency of plaintiff's complaint. First, bearing in mind that a court must

5

accept as true all factual allegations in the complaint, this court must segregate allegations that are factually supported from those which are mere legal conclusions or naked assertions and not entitled to a presumption of truth. *Iqbal*, 129 S. Ct. at 1950. Second, this court must determine whether the remaining factual allegations in the complaint state a plausible claim for relief, based on "judicial experience and common sense." *Id.*

## **ANALYSIS**

I.     **Choice of Law**

In a diversity action, a federal court must apply the choice of law rules of the state in which it sits. *Klaxton Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Where a transferee court presides over several diversity actions consolidated by the Multidistrict Litigation Panel, the choice of law rules applied are that of each jurisdiction in which the transferred actions were originally filed. *Chang v. Baxter Healthcare Corp.*, 599 F.3d 728 (7th Cir. 2010); *In re Air Disaster at Ramstein Air Base, Germany, on 8/29/90*, 81 F.3d 570, 576 (5th Cir. 1996). The *Arthur* action originated in the Southern District of California while the *Terry* action originated in District of South Carolina. California "will apply its own rule of decision unless a party invokes the law of a foreign state." *Paulsen v. CNF Inc.*, 559 F.3d 1061, 1080 (9th Cir. 2009). If a party asserts that a law other than California's should apply, the court must undertake the "governmental interest" analysis to determine the applicable substantive law. *Reich v. Purcell*, 432 P.2d 727 (Cal. 1967). No party to the *Arthur* action asserts that a particular law should apply, and in the absence of such an argument the court will apply the law of California to the *Arthur* Exchangers. South Carolina subscribes to the

doctrine of lex loci delicti and applies the law of the place of the wrong. *Dawkins v. State*, 412 S.E.2d 407, 408 (S.C. 1991). All wrongs alleged in the complaint appear to have occurred in Richmond, Virginia. As such, the court will apply the law of Virginia in ruling on the *Terry* claims. Of course, the Exchange Agreement entered into between LES and all of the Exchangers provides that it will be governed by Virginia law; therefore, to the extent the Exchange Agreement is applicable to the aiding and abetting a breach of fiduciary duty cause of action, the court will look to Virginia law with respect to that claim asserted by both the *Arthur* and *Terry* Exchangers.

II.     **Aiding and Abetting a Breach of Fiduciary Duty**

The Exchangers first allege that SunTrust aided and abetted LES in breaching the fiduciary duties it owed them. In making this assertion, the Exchangers allege that SunTrust had actual knowledge that LES served as a fiduciary for the Exchangers and had actual knowledge that LES was breaching its fiduciary duty. At the outset, SunTrust asks the court to dismiss this cause of action because it asserts that LES did not owe the Exchangers a fiduciary duty under the facts of this case. To support its argument, SunTrust cites to the decisions of a United States Bankruptcy Court for the Eastern District of Virginia, which reviewed exchange agreements identical to the ones entered into by LES and the Exchangers and found that such a fiduciary relationship does not exist between the two under Virginia law. *See Frontier Pepper's Ferry, LLC v. LandAmerica 1031 Exch. Servs.*, No. 08-35994,

7

2009 Bankr. LEXIS 4133 (May 7, 2009).[2] In response, the Exchangers urge the court not to follow the bankruptcy court's decisions because they believe those decisions were wrongly decided and are not controlling on this court. They claim that LES did in fact owe them a fiduciary duty because it held their Exchange Funds in trust or escrow.

      The court is aware that it is not bound by the bankruptcy court's decision, and it has taken into account the Plaintiffs' numerous objections to the bankruptcy court's order. But after a close examination of the bankruptcy judge's analysis, the court adopts the bankruptcy court's reasoning and ruling on this issue. The court understands that the bankruptcy court's overall objective of its decision was to determine what property was to be included within a bankruptcy estate, which is not the issue before this court. But the court does not believe that overarching inquiry affected the court's analysis of the creation of a fiduciary relationship between LES and the exchangers under Virginia law. Accordingly, for those reasons expressed by the bankruptcy court in *Frontier Pepper's Ferry, LLC v. LandAmerica 1031 Exch. Servs.*, No. 08-35994, 2009 Bankr. LEXIS 4133 (May 7, 2009), the court finds that Virginia law would not impose a fiduciary relationship between LES and the Plaintiffs under the facts of this case through either an express or resulting trust.

      The court further finds that the same reasons that lead the bankruptcy court to conclude that neither an express trust nor resulting trust was created between the parties in

---

[2] The Exchange Agreement between the Exchangers and LES in this case also contain a choice of law provision that provide for Virginia law to control any dispute arising between the parties.

that case also preclude the finding that LES served as a special agent, real estate broker, or any other type of fiduciary for the Exchangers in this case. The court acknowledges the Plaintiffs' argument that the Treasury Regulations do not preclude a qualified intermediary from being an agent for an exchanger, except for purposes of determining whether or not the exchanger is in constructive receipt of the exchange funds; however, this general principle does not establish that the Exchange Agreement entered into between LES and the Exchangers created a special agency relationship between LES and the Exchangers or made LES a real estate broker. This is especially so in light of the disclaimer language that LES was only obligated to act as an intermediary in accordance with the terms and conditions of the Exchange Agreement. (See Second Am. Compl. Ex. 1 ¶ 6(c)). Moreover, the court has not been made aware of any Virginia law that makes a qualified intermediary a fiduciary as a matter of law, and the court does not believe it is the proper authority to determine such on first impression. And, of course, the Exchangers and LES agreed in their Exchange Agreement that LES would only take on the duties as expressed in the agreement and would not undertake to perform any additional duties that may arise as an operation of law.

The court is mindful of the terrible situation LES has brought upon the Exchangers and is sympathetic to their position. But the court cannot look beyond the terms of the Exchange Agreement, which unambiguously state the parameters of the parties' relationship, and without more of a showing by the Exchangers that Virginia law directs a conclusion different from the one reached by the bankruptcy court's thorough analysis of the matter, the court finds that Virginia law would not recognize a fiduciary relationship between LES and

9

the Exchangers under the facts of this case. Accordingly, the court grants SunTrust's motion to dismiss the Exchangers' aiding and abetting a breach of a fiduciary duty cause of action against the bank.

III. **<u>Conversion and Aiding and Abetting a Conversion</u>**

Next the Exchangers assert a conversion and an aiding and abetting conversion causes of action against SunTrust. Specifically, they allege that SunTrust converted their intangible property rights merged within the Exchange Agreement, including (1) the right to replacement property; (2) the right associated with deferring taxable gain; and (3) the unconditional guarantee of the return of the Exchange Funds. The complaint also alleges that SunTrust's use of the Exchange Funds for unauthorized purposes constituted conversion. Again, SunTrust moves the court to dismiss these two causes of action against it. First, it contends that the Exchangers failed to plead that SunTrust, rather than LES, converted their Exchange Funds; therefore, it believes the court must dismiss the conversion cause of action. Next, SunTrust contends that both of these causes of action must be dismissed because the Exchangers were not entitled to immediate possession of the Exchange Funds.

Under Virginia law, "[a] person is liable for conversion for the wrongful exercise or assumption of authority over another's goods, depriving the owner of possession, or any act of dominion wrongfully exerted over the property in denial of, or inconsistent with, the owner's rights." *Simmons v. Miller*, 544 S.E.2d 666, 679 (Va. 2001). "It is not necessary that there be a manual taking of the property; it is only necessary to show an assumption of control or ownership over the property, or that the alleged converter has applied the property

10

to his own use." *Federal Ins. Co. v. Smith*, 144 F. Supp. 2d 507, 520 (E.D. Va. 2001) (quoting *Oakdale Village Group v. Fong*, 50 Cal. Rptr. 2d 810, 812 (Cal. Ct. App. 1996)); *see also Univ. C.I.T. Credit Corp. v. Kaplan*, 92 S.E.2d 359 (Va. 1956) ("It is not necessary that the wrongdoer apply the property to his own use"). In general, a cause of action for conversion applies only to tangible property; "[h]owever[,] many courts have recognized the tort of conversion in cases where intangible property rights arise from or are merged with a document, such as a valid stock certificate, promissory note, or bond," *United Leasing Corp. v. Thrift Ins. Corp.*, 440 S.E.2d 902, 906 (Va. 1994). However, a cause of action for conversion does not encompass claims for undocumented intangible property rights. *Id.*, *Fremont Indem. Co. v. Fremont Gen. Corp.*, 55 Cal. Rptr. 621, 638 (Cal. Ct. App. 2007). The touchstone for recognizing a documented intangible property right is whether the right amounts to "a clear, definite, undisputed, and obvious property right in a thing to which they are entitled to immediate possession." *Id.*

Under California law, the test is substantially similar. *See Wanetick v. Mel's of Modesto, Inc.*, 811 F. Supp. 1402, 1409 (N.D. Cal. 1992) ("To bring an action for conversion, a plaintiff must establish that he or she had actual possession of the property . . . or the right to immediate possession of the property at the time the alleged conversion occurred."). However, California appears to differ to a degree, only requiring some connection between a document or something tangible and the purportedly converted property right. *Kremen v. Cohen*, 337 F.3d 1024, 1033 (9th Cir. 2003). In the case of funds, an action for conversion is proper where "the amount of money [is] readily ascertainable,"

11

*PCO, Inc., v. Christiansen, Miller, Fink, Jacobs, Glaser Weil & Shapiro, LLP*, 58 Cal. Rptr. 3d 516, 525 (Cal. Ct. App. 2007), and that the plaintiff was entitled to immediate possession at the time the funds were allegedly converted. *Terry v. Bank of Am., N.A.*, 350 F. Supp. 2d 727, 729–30 (W.D. Va. 2004); *Wanetick v. Mel's of Modesto, Inc.*, 811 F. Supp 1402 (N.D. Cal. 1992); *Fischer v. Machado*, 58 Cal. Rptr. 2d 213 (Cal. App. 3 Dist 1996) (noting that to establish conversion, a plaintiff must establish actual interference with his ownership or right of possession.).

After considering the Exchangers' second amended complaint, SunTrust's renewed motion to dismiss, and the other briefs filed, the court grants SunTrust's motion to dismiss these two causes of action. For the reasons announced by this court in its previous order dismissing these causes of action, (DE # 107 at 17), the court again finds that the intangible property/contract rights the Exchangers seek should be dismissed. The court also maintains its earlier finding that the Exchangers did not have an immediate right to possession of the Exchange Funds after they transferred the funds to LES, as the Exchange Agreement stated that the Exchangers may not access their Exchange Fund for 45 days after initiating the § 1031 exchange process. (Second Am. Compl. Ex. 1 ¶ 2(c); DE # 107 at 18–19.). Because they did not have an immediate right to possession of their Exchange Funds, the court dismisses the conversion and aiding and abetting conversion causes of action.

## IV. **Civil Conspiracy**

To prove civil conspiracy, a plaintiff must allege (1) the formation and operation of a conspiracy, (2) the wrongful act or acts done pursuant thereto, and (3) the damage resulting

from such act or acts. *See, e.g.*, *Wasco Prod., Inc. v. Southwall Technologies, Inc.*, 435 F.3d 989, 992 (9th Cir. 2006), *Firestone v. Wiley*, 485 F. Supp. 2d 694, 703 (E.D. Va. 2007) (noting that the Supreme Court of Virginia requires proof that the underlying tort was committed—where there is no underlying wrong, there can be no action for civil conspiracy). To survive a motion to dismiss, Virginia requires a plaintiff to allege some details of time and place and the alleged effect of the conspiracy, *Firestone*, 485 F. Supp. 2d at 704, and California requires more than bare legal conclusions. *117 Sales Corp. v. Olsen*, 145 Cal. Rptr. 778, 780 (Cal. Ct. App. 1978). Again, after considering the Exchangers' second amended complaint, SunTrust's motion to dismiss, and the other briefs filed in this matter, the court maintains its previous finding that the Exchangers have failed to sufficiently plead a civil conspiracy cause of action, as the court has already dismissed the underlying tort causes of action which would support a claim for civil conspiracy.

## **CONCLUSION**

Therefore, based on the forgoing, the court hereby dismisses the Exchangers' second amended complaint, insofar as it relates to SunTrust, for failure to state a claim upon which relief may be granted.

IT IS SO ORDERED.

June 15, 2011  Joseph F. Anderson, Jr.
Columbia, South Carolina  United States District Judge